UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Crim. No. 07-100 (GK) |
| v. ) | |
| MARIBEL GUILLEN ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Maribel Guillen, through undersigned counsel, respectfully submits the following memorandum in aid of sentencing.

**Procedural History**

Ms. Guillen is before the Court awaiting sentencing after she entered a guilty plea on April 26, 2007. Ms. Guillen pled guilty to a one count information charging her with Wire Fraud in violation of 18 U.S.C. § 1343. Pursuant to the conviction Ms. Guillen faces a maximum sentence of twenty years of incarceration, followed by a term of supervised release of not more than three years, a maximum fine of $250,000.00 dollars and a $100.00 dollar special assessment.

In her Pre-Sentence Investigation Report ("PSR"), Probation Officer Kelly Kraemer-Soares, has calculated a sentencing range of 15-21 months of incarceration pursuant to the advisory United States Sentencing Guidelines. The range is based on a Base Offense level 14 and a Criminal History Category I. Ms. Guillen will appear before the Court for her Sentencing Hearing on June 20, 2007.

## ARGUMENT IN SUPPORT FOR A SENTENCE OF PROBATION

**Personal History and Background**

Ms. Guillen is before the Court facing her first criminal conviction. In fact, prior to the instant offense Ms. Guillen had never been arrested or charged with any criminal act. The instant offense is anomalous in an otherwise exemplary life of impeccable conduct, academic commitment and achievement and family loyalty and respect. That she will appear for a sentencing hearing is an errant departure from the principles and values that she was taught by her parents and grandparents.

Ms. Guillen's grandparents came to this country in search of work and the opportunity to provide for their children what they could not in their native Mexico. Ms. Guillen's mother, Maria Garcia de Alba, came to this country when she was fifteen years old. Her father, Jose Guillen, was sixteen years old when he arrived from Mexico. Maria Garcia de Alba took her parents' pioneering struggle to heart and succeeded academically even though she started high school without knowing a word of the English language.

After she had three daughters with Jose Guillen, Mrs. Maria Guillen continued her education by attending college while maintaining a full time job. After graduating from college, Mrs. Guillen chose to become a public school teacher. Mrs. Guillen taught her three daughters the value of education and hard work as the means to succeed in their adopted country. Ms. Maribel Guillen by all accounts learned and followed her mother's example of breaking barriers and aspiring beyond what her parents and grandparents were able to achieve. Ms. Guillen applied herself in the Torrence Public School system and succeeded at every level.

Ms. Guillen succeeded notwithstanding family problems and personal traumas. When

she was ten years old, her parents divorced for the first time. The family situation became more stressful with a traumatic event surrounding her older sister. See PSR ¶ 35. Sadly, Ms. Guillen also suffered a similar experience.[1] After Ms. Guillen's family was victimized by an armed burglary, her father returned to the household.

Despite these hardships, Ms. Guillen was admitted and attended, the University of California at Los Angeles, a nationally recognized elite university. At UCLA Ms. Guillen excelled while working part time to supplement her expenses. Academically, her interest in languages was the catalyst for studying a semester in France. After college she moved to France to work and to continue her study of French. Although she enjoyed working and living in France, Ms. Guillen returned to the United States when she learned that her mother was having severe medical problems.

After her mother's health stabilized, Ms. Guillen came to the District of Columbia without a job but with the enthusiasm and aspirations that led her to UCLA and France. A month after she moved to Washington Ms. Guillen was employed by the International Intellectual Property Institute (IIPI). What was supposed to be the beginning of a promising professional career regrettably turned into the most difficult period in her life.

There is no simple explanation for Ms. Guillen's conduct. Ironically, right when it appeared that her life was entering a successful phase, a whirlwind of problems coalesced around her. Her personal relationship which was a motivating factor in moving to Washington fell apart. She also found herself unable to meet the financial obligations of living on her salary and of paying her student loans. Meanwhile, her mother's health started to deteriorate once again which

---

[1] See April 29, 2005 medical Report by Dr. David P. Wolfe

undermined any optimism for her future well being. Then when it seemed that her life was at the breaking point, Ms. Guillen started experiencing severe health problems.

Early in 2005, Ms. Guillen's health was so precarious that she underwent a heart catheterization to determine if she was suffering from Pulmonary Hypertension, a complex and rare disease which is difficult to treat. After Pulmonary Hypertension was ruled out Ms. Guillen's continuing symptoms suggested either Pleurisy, significant Raynaud's Phenomenon, or Fibromyalgia. What was not a mystery were the chest pains, the headaches, the shortness of breath, knee and back pain, pervasive daytime fatigue and persistent insomnia. Equally revealing and troubling is the commentary in the April 29 '05 report under the subheading titled "Impression." Clearly, Ms. Guillen was experiencing the beginning of a health crisis within six months of beginning her employment at the IIPI. Understandably, the mysterious illnesses and symptoms came to play a major role in Ms. Guillen's life.

Follow up medical appointments and evaluations showed that Ms. Guillen's symptoms far from subsiding were increasing and diversifying to include nosebleeds, blurry vision, and bruising. Her symptoms were narrowed down to either Fibromyalgia syndrome and the more threatening and debilitating Lupus. See May 23, '05 Medical Report. Follow up medical reports also show that as her symptoms increased various medical experts evaluated her in an effort to accurately diagnose her illness. To that end Ms. Guillen was examined by a hematologist, a neurologist, an ophthalmologist, an endocrinologist, and a pulmonary specialist. At one point her chest pains were so severe that she went to the George Washington Hospital emergency room. See August 29, '05 Medical Report. By the fall of 2005 Ms. Guillen was suffering from persistent Upper Respiratory Infections. See October 13, 2005 Medical Report. On account of

her deteriorating health Ms. Guillen had to stop exercising and was mostly homebound because of the pervasive and consuming fatigue.

By the time she resigned from IIPI, Ms. Guillen's health had continued to deteriorate and emotionally she struggled with the news that a close friend was diagnosed with cancer. After resigning from IILP, Ms. Guillen was without medical insurance and for at least a couple of months was unable to buy her prescription medicine. It appeared that on account of the stress and anxiety relating to her job and personal situation Ms. Guillen started having persistent anorexia.

In August 2005, Ms. Guillen was conclusively diagnosed with Lupus. Ms. Guillen has been informed by her doctor that the disease will stay with her for the remainder of her life. To her credit, once she was diagnosed with Lupus, Ms. Guillen regained a measure of stability that had been missing for nearly two years. The diagnosis of Lupus freed Ms. Guillen from the oppressive fear and anxiety of not knowing what was causing her many ailments.

In her short time in Washington, Ms. Guillen has been through wrenching professional and health experiences. In a testament to her courage and resilience Ms. Guillen will appear for her sentencing hearing with a new found sense of purpose. Ms. Guillen has accepted and learned how to live with Lupus. She has found gainful and challenging employment as an administrative assistant. See PSR ¶ 50. Equally important, Ms. Guillen wants to bring stability and responsibility back to her life in order to support her mother who was recently diagnosed with Leukemia.

Ms. Guillen began putting her life back together when she admitted her wrongdoing at the first opportunity to do so. When IILP staff questioned Ms. Guillen about financial irregularities,

she admitted wrongfully taken money from the organization. Thereafter, she admitted to FBI agents that she had embezzled money from her employer. The government's memorandum succinctly summarizes Ms. Guillen's repeated and candid admissions of culpability. In short, Ms. Guillen never hesitated in her resolve to enter a guilty plea to her criminal conduct.

Undersigned counsel has had the opportunity of knowing Ms. Guillen during this very difficult period in her life. Immediately after being assigned to represent Ms. Guillen, she made it clear that she wanted to enter a guilty plea. Her decision was based on the simple fact that she had taken money that didn't belong to her. Ms. Guillen never thought of challenging the allegation since it would have been misleading and dishonest to do so. She recognized that it was her dishonesty that ushered her legal predicament.

Ms. Guillen wants to prove to the Court, to her family, and the government that she can contribute to her community and that she can and will live out the remainder of her adult life in a lawful manner. Ms. Guillen is asking the Court for leniency so that she may continue to work, pay back the money she wrongfully took, and to make amends through community service and home confinement.

As a first time criminal offender Mr. Guillen wants the opportunity to demonstrate a commitment to responsible and law abiding behavior. On account of the totality and circumstance of her life and pursuant to the applicable sentencing statutes and case law, Ms. Guillen respectfully requests that the Court sentence her to a period of probation of five years.

**A.** **PURSUANT TO UNITED STATES v. BOOKER , 18 U.S.C. § 3553(a), 18 U.S.C. § 3582,  18 U.S.C. § 3562 AND 28 U.S.C. § 991(b)(1)(B) THE COURT HAS AUTHORITY TO  SENTENCE MS. GUILLEN TO A TERM OF PROBATION**

In United States v. Booker, the Supreme Court held that the mandatory sentencing

6

guidelines were unconstitutional as applied. 125 S. Ct. 738 (2005)  The Court further held that judges are required to "take account of the Guidelines <u>together</u> <u>with</u> other sentencing factors," and to "consider" the guidelines along with all the other required factors (emphasis added).  The Court is not bound by the guideline range and there is no requirement that a sentence be within the guideline range.  The guideline range is just one factor to be considered along with the mandatory statutory factors delineated in 18 U.S.C. § 3553(a).

Those factors include, among others, the nature of the offense, the defendant's history, the need for the sentence to promote adequate deterrence and to provide the defendant with the needed educational or vocational training, and pertinent policy statements issued by the sentencing commission, the need to avoid unwarranted sentencing disparities among similarly situated defendants. <u>U.S. v. Clifton Price</u> 409 F.3d 436, 442 (D.C. Cir. 2005) Moreover, Sentencing Courts have a continuing duty to "[w]eigh the purposes of sentencing listed in the Sentencing Reform Act." <u>U.S. v. Jabber</u> 362 F.Supp.2d 365, 369 (D. Mass. 2005).

The primary purpose of the sentencing statute, 18 U.S.C. 3553(a), is for the sentencing court to impose a sufficient sentence, but not one that is greater than necessary.  18 U.S.C. § 3553(a) allows the Court to take into account the particularized factors of Mr. Guillen's life and not just the fact of her criminal conduct. This approach is consistent with the goals of 28 U.S.C § 991, the enabling statute of the Sentencing Commission.  The enabling statute and the sentencing statue contemplate a flexible and particularized approach to sentencing determinations that were abandoned under the pre-<u>Booker</u> mandatory sentencing guideline regime.  28 U.S.C. § 991(b)(1)(B) supports a sentence that is not determined, solely, by a rigid formula that ignores the statutory factors set forth in 18 U.S.C. § 3553(a).

Congress created the Sentencing Commission with the goal of creating a method and structure for Courts to achieve uniformity and fairness in sentencing.  However, the enabling statute did not lose sight nor preclude the notion of individualized sentencing.  28 U.S.C. § 991(b)(1)(B) provides Sentencing Courts with discretion to "maint[ain] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Application of 18 U.S.C. § 3553(a) along with the flexibility encouraged by 28 U.S.C. § 991(b)(1)(B) strongly suggests that a sentence of probation accomplishes the goals of the two statutes.

**The Nature and Circumstances of the Offense**

Ms. Guillen's nonviolent criminal conduct took place during a very difficult period in her life.  The modest salary that she earned in the face of mounting medical bills while suffering from mysterious illnesses was compounded by personal crises.  One source of distress was her mother's deteriorating health.  In Washington Ms. Guillen found herself alone after her boyfriend terminated their relationship.  Not long after, Ms. Guillen was mugged.  As she suffered from exhaustion and debilitation from an undiagnosed condition, her depression brought her to the thought of harming herself.

Although, her health and personal crises do not excuse her criminal behavior, which she has never sought to justify, it was at a point of desperation when she began taking money from her employer.  What began as modest amounts of money very shortly turned into substantial sums of money.   However, Ms. Guillen never denied her criminal responsibility nor minimized her acts.  She acknowledged her wrongful conduct to her employer, the FBI investigators, to Assistant United States Ronald Sharpe and to the Court.

**History and Characteristics of Ms. Guillen**

Ms. Guillen is a highly motivated and capable person. Despite childhood traumas, including her parents' divorces, and a burglary of their home, she persevered and attended UCLA. Ms. Guillen studied abroad and later lived and worked in Paris, France. Currently, she is gainfully employed and her fluency in Spanish has provided a significant financial benefit to her current employer. Instead of outsourcing the translation of documents and reports, Ms. Guillen can handle those assignments and save her employer a substantial amount of money. See Staff Performance Evaluation Report at P. 3.

Throughout her life Ms. Guillen has battled with depression and devastating illnesses. Almost two years ago she was diagnosed with Lupus, Fibrommyalgia and migraines. As previously stated, her mental condition and mental health played a significant role in her criminal conduct. However, Ms. Guillen has picked herself up without the assistance of anyone and has turned the corner in redeeming her life.

With the exception of the instant offense, Ms. Guillen has led a productive, law abiding, and accomplished academic life. Ms. Guillen's efforts to lead a productive life, extends professionally and personally. Ms. Guillen's professional life can be characterized by hard work, and the desire to learn with the goal of improving and realizing her professional potential. Although, Ms. Guillen brought about her current adversity and predicament, she has managed to pick herself up through her own efforts and determination. Remarkably, she has been able to do so in the face of Lupus, Fibrommyalgia, and depression.

**The Sentence should reflect the Seriousness of the Offense**

Ms. Guillen recognizes that the Court must impose a sentence that reflects the seriousness

9

of the offense, promotes respect for the law, and provides just punishment.  While the sentence must provide deterrence and protect the public, it must also provide Ms. Guillen with educational and vocational training and medical care.  In balancing all of the purposes of sentencing, the Court must also impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2)[§ 3553]."  See 18 U.S.C. § 3553(a).

    A sentence that places Ms. Guillen on community supervision and restricts her to home confinement would be more than adequate to meet the sentencing purposes set forth in 18 U.S.C. § 3553(2)(a).[2]  The felony conviction on its own will have employment and voting consequences for the rest of her life.  Probation will require a sustained commitment to responsible behavior.

    Ms. Guillen recognized the seriousness of her criminal conduct and readily took responsibility for her actions.  Upon being confronted with her embezzlement, Ms. Guillen immediately admitted her actions.  She cooperated with the government throughout, and provided a statement and a detailed account of her embezzlement to the lead FBI agent.  When Ms. Guillen met with undersigned counsel, she immediately stated that she committed a crime and had to suffer the consequences.

    Incarceration would result in a sentence that is "greater than necessary."  Incarceration will certainly cause Ms. Guillen substantial suffering.  Beyond her removal from the community Ms. Guillen will lose her job.  For a young woman who is suffering from multiple chronic illnesses, incarceration could potentially eliminate any or most of her employment prospects.

---

[2] This approach of considering charged conduct, real offense behavior, and the full breadth of a defendant's characteristics "ensures that the punishment will suit not merely the offense but the individual defendant." Wasman v. United States, 468 U.S. 559, 564, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984).

This would be a tragic outcome for a very capable young woman who up until she began embezzling from her employer had led an exemplary academic and professional life.

### The sentence should afford adequate deterrence to criminal conduct

A sentence of probation will more than adequately protect the public and achieve adequate deterrence for the following reasons. First, Ms. Guillen is a first time offender who throughout her life has demonstrated sound decision making skills. She will be subjected to a strict supervision regimen which will include reporting to a probation officer, submitting monthly financial reports, making mandatory restitution payments and will be required to report any change in her residence, employment and travel outside of the metropolitan area.

Ms. Guillen has been shamed by her conduct. Knowing that she will be forever branded as a convicted felon has been extremely painful, humiliating and resulted in endless self deprecation. To this day she still hasn't had the wherewithal to tell her father of her criminal conduct and conviction. She knows that she has disappointed her mother and sisters. The felony conviction will automatically preclude Ms. Guillen from being hired for a financial position of trust. It is doubtful that any finance or business oriented company would consider hiring her.

Her obligation to pay more than 100,000.00 dollars in restitution requires significant responsibility, planning and the commitment to lead a modest life. All of these factors will weigh heavy in her everyday life. By no means would this structure of obligations and responsibilities be a mere slap on the wrist. It can be reasonably assumed that recidivism for Ms. Guillen is unlikely and the terms and requirements of probation should adequately protect the public.

**The sentence should provide the most effective rehabilitation treatment**

A sentence of probation would most effectively result in Ms. Guillen's rehabilitation. If placed on probation Ms. Guillen can continue the progress she has thus far demonstrated in her current employment. She will also be in a position to immediately begin her restitution payments and she can finally commit herself to long term therapy. Any period of incarceration will undermine the post offense rehabilitation that has already taken place, it will mean the loss of her job, of her livelihood, and she will be hard pressed to make restitution payments after leaving prison.

Ms. Guillen has been diagnosed as clinically depressed and at one point contemplated suicide. Incarceration could seriously undermine Ms. Guillen's mental and physical health. Probation on the other hand imposes a strict, but manageable, set of requirements which include reporting to the probation officer, maintaining employment, making restitution payments and following through with mental health counseling. Accordingly, probation is the most effective way to provide Ms. Guillen with the assistance that will result in her rehabilitation.

As the Pre-Sentence Investigation Report indicates, Ms. Guillen has pled guilty to a Class C felony. See PSR ¶ 69. 18 U.S.C. §3561 allows for a sentence of probation for a period not to exceed five years.§ 3561(c)(1). 18 U.S.C. §3562 authorizes the Court with the discretion to impose a sentence of probation when appropriate. 18 U.S.C. §3561(a) directs the Court to impose a sentence of probation only after a consideration of "the factors set forth in section 3553(a) to the extent that they are applicable." A sentence of probation is appropriate in the instant case. Ms. Guillen's history, the content of her person, the respect that she has shown for the law during the pendency of her case and her commitment to her mother and to her current

employer support continuing her rehabilitation in the community.

A sentence of probation, which includes mandatory restitution, community service and home confinement, along with the life long consequences of a felony conviction can be "just punishment" when the Court considers 18 U.S.C.§3582(a).  In pertinent part 18 U.S.C. § 3582 (a) states

> "The Court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) **to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation**" (emphasis added)

### **CONCLUSION**

In the context of Ms. Guillen's character and background it is safe to assume that it is very unlikely that she will re-engage in any criminal conduct.  Ms. Guillen has obsessively ruminated and made a very sobering evaluation of her wrongful conduct.  It is unquestioned that Ms. Guillen had previously led a crime free, productive and family oriented life.  That she finds herself in Federal District Court awaiting sentencing is inconsistent with the success, aspirations and accomplishments of her life as a teenager, college student, and as a young adult.

Ms. Guillen is a decent and well meaning young woman who made a series of terrible decisions.  Those decisions have cost her dearly.  Ms. Guillen now has a felony conviction on her record which will have consequences for the remainder of her life.  Ms. Guillen, knows that she cannot undo her mistake.  She does know that she will never engage in any activity that will put her livelihood in jeopardy.  Ms. Guillen wants the Court to give her one opportunity so that she can demonstrate that she will continue to lead an exemplary life that is characterized by honesty,

hard work and responsibility to her community and family.

So that Ms. Guillen does not lose sight of the transgression that she committed, undersigned counsel requests that the Court sentence her to a period of Probation of five years. Furthermore, undersigned requests that Mr. Guillen serve her first six months of probation under electronic home monitoring consistent with her work schedule, and medical and counseling needs. The Court has at its disposable other conditions of probation pursuant to 18 U.S.C. §3563 if it believes that Ms. Guillen requires more guidance and restrictions. For these reasons undersigned requests that the Court sentence Maribel Guillen to a period of probation of five years.

          Respectfully submitted,

          A.J. Kramer
          Federal Public Defender


          _____
          Carlos J. Vanegas
          Assistant Federal Public Defender
          625 Indiana Ave., N.W., Suite 550
          Washington, D.C. 20004
          (202) 208-7500