UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
UNITED STATES OF AMERICA,       )
                                )
        Plaintiff-Appellee,     )
                                )
    v.                          )    Crim. No. 07-100 (GK)
                                )    (Appeal No. 07-3077)
MARIBEL A. GUILLEN,             )
                                )
        Defendant-Appellant,    )
                                )
_____)
```

PLAINTIFF-APPELLEE'S OPPOSITION TO DEFENDANT-
APPELLANT'S MOTION FOR RELEASE PENDING APPEAL

The United States opposes defendant's motion for release pending appeal ("Motion"). To prevail on her motion, defendant must show, <u>inter alia</u>, that her "appeal . . . raises a substantial question of law or fact likely to result in . . . a reduced sentence to a term of imprisonment less than the total time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv); Fed. R. Crim. P. 46(c).[1] Defendant has failed to make that showing, and her motion should therefore be denied.

<u>BACKGROUND</u>

By information filed on April 18, 2007, the government charged defendant with one count of wire fraud (18 U.S.C. § 1343) (Dkt. 1).

---

[1] For purposes of this motion, the government does not contend that defendant is either a flight risk or a danger to the community. <u>See</u> 18 U.S.C. § 3143(b)(1)(A).

At an April 26, 2007, plea hearing, defendant pleaded guilty to the information, pursuant to a plea agreement (Dkt. 7; 4/26:19-20).[2] As part of the plea agreement, defendant stipulated that:

- from April 2004 until January 2006, she was employed at the International Intellectual Property Institute ("IIPI"), where she was responsible for the organization's financial accounting;

- starting in December 2004, she carried out an embezzlement scheme in which she (1) manually prepared checks made payable to herself or petty cash, used a rubber stamp bearing the signature of IIPI's chairman to endorse the checks, and deposited the checks into her personal bank accounts or cashed them, and (2) used IIPI's corporate credit card to make personal on-line purchases from merchants located outside Washington, D.C., get cash advances, and receive convenience checks, then paid off the credit-card balances by making on-line debit payments from IIPI's operating account;

- she concealed the embezzlement by intercepting, hiding, or destroying IIPI credit-card statements, operating-account bank statements, and returned checks;

- in early 2006, when confronted by IIPI's executive director about a check written on the organization's operating account, she falsely claimed that she was only trying to obtain a payroll advance and that this was the first time she had attempted to cash a check written on the operating account without authorization.  In January 2006, she resigned at IIPI's request;

- in March 2006, she met with IIPI officials and admitted the embezzlement.  In August 2006, she provided a voluntary, written statement to the FBI admitting the embezzlement; and,

---

[2]     The transcripts of the 2007 plea and sentencing proceedings will be cited by date and page number as follows:  "MM/DD:[page]". For the Court's convenience, we have attached the transcripts as exhibits.

- as a result of the embezzlement, IIPI suffered actual losses in excess of $107,000.  (Dkt. 6.)

Also as part of the plea agreement, defendant waived her right to appeal her sentence unless the sentence exceeded either the statutory maximum or the applicable Guidelines range (Dkt. 7 at 5). Before accepting defendant's plea, this Court explained the waiver provision to her, stating that she "is giving up her right to appeal any sentence she receives unless I sentence her to a period longer than 20 years or unless I depart upwards from the guideline range" (4/26:18).[3]  In response, defendant's counsel affirmed that the Court had accurately described the appeal waiver, and defendant herself reaffirmed that she understood and accepted the appeal waiver (id.).

The sentencing hearing was held on June 20, 2007.  After hearing presentations from both parties' attorneys, and a statement from defendant, the Court first calculated the Guidelines range for defendant's sentence (6/20:3-21).  Finding that defendant's total offense level was 14 (including a two-level enhancement for abuse of a position of trust and a three-level decrease for defendant's "very substantial cooperation"), and that her lack of prior convictions put her in Criminal History Category I, the Court held

---

[3]    Government counsel and defendant's counsel confirmed on the record that they both calculated the Guidelines range as 15-21 months' imprisonment (4/26:15; see also Dkt. 7 at 2).

that, "[i]n terms of the advisory guidelines, that places her in a range of 15 to 21 months" (id. at 21).[4]

The Court then considered the additional sentencing factors identified in 18 U.S.C. § 3553(a), including, inter alia, defendant's age, education, medical condition, and family and job histories; defendant's counsel's arguments for a sentence of probation; and various countervailing considerations, including the "enormous amount of money" defendant embezzled, the fact that the victim of her crime was a non-profit organization working "for the betterment of the world," the fact that defendant stole the money not for medical treatment or other necessities but instead to finance "spending sprees," and the need for the sentence to reflect "the seriousness of this offense" and to provide "adequate deterrence of this kind of criminal conduct" (6/20:11, 22-25). Taking all these considerations into account, the Court held that the Guidelines range "meets the requirements of 18 U.S.C. § 3553" (id. at 25). The Court further held that, in light of defendant's lack of a criminal record and her cooperation, "a sentence at the very bottom of the guidelines is appropriate" (id.). The Court sentenced defendant to a prison term of 15 months, to be followed

---

[4]    The probation office also calculated the Guidelines range as 15-21 months. Pre-Sentence Investigation Report ("PSR") at ¶ 70. The probation office did not recommend either a departure or a variance from this range. PSR at ¶ 88.

by two years' supervised release (id. at 26).  The Court also ordered defendant to pay restitution in the amount of $107,208.31, and to pay a special assessment of $100 (id.).  The court granted defendant's unopposed request for voluntary surrender (id.).

On July 11, 2007, defendant filed a timely notice of appeal (Dkt. 18).  On July 19, 2007, this Court ordered defendant to surrender to FMC Carswell in Fort Worth, Texas, by August 16, 2007 (Dkt. 19).  As of the date of this writing, defendant still has not reported to FMC Carswell.  Given defendant's repeated claims that she is unable to begin serving her sentence because of her medical condition (Dkt. 20, 23, 24, 25), this Court has both granted her request to temporarily move to California so that she can live with and be cared for by her parents, and several times postponed her reporting date (Dkt. 21, 25, 33; see also Minute Entries for status conferences held on 9/13/07, 11/07/07, 12/04/07, 2/13/08, and 4/17/08).  Most recently, defendant failed to report to prison as required on June 5, 2008 (Dkt. 36).  On June 12, 2008, this Court granted defendant's motion to stay issuance of an arrest warrant and ordered defendant's counsel to submit status reports regarding defendant's medical condition every two weeks, the first one to be due on June 26, 2008 (Dkt. 37).  A new reporting date will not be set until defendant is discharged from the medical facility at which she currently is located (id.).

<u>ARGUMENT</u>

Defendant argues that she should be released pending appeal because, according to her, her appeal raises a "substantial question of law" within the meaning of 18 U.S.C. § 3143(b) (Motion at 3). Specifically, defendant claims that: (1) her sentence is procedurally flawed because this Court allegedly treated the Guidelines range of 15-21 months as presumptively reasonable; and (2) her sentence is substantively unreasonable because this Court allegedly failed to "adequately consider" (a) her exceptional assistance to authorities, (b) her unusually poor health, and (c) the possibility of community confinement rather than incarceration (<u>id.</u> at 4-5).

Defendant's arguments are flawed in many respects. Most simply, there is no reason to suppose that the duration of the appellate process in this case will exceed the sentence defendant ultimately would serve if she were to prevail on appeal. Defendant's motion must be denied on that ground alone. <u>See</u> 18 U.S.C. § 3143(b)(1)(B)(iv) (requiring that defendant sentenced to term of imprisonment "be detained," unless defendant shows that appeal is "likely to result" in, at least, prison term "less than the total of the time already served plus the expected duration of the appeal process"); <u>see also</u> <u>United States v. Perholtz</u>, 836 F.2d 554, 556 (D.C. Cir. 1987) (per curiam) (noting that "[t]he law has

-6-

shifted from a presumption of release to a presumption of valid conviction").

First, the appellate process already is far advanced. The appeal was fully briefed as of April 11, 2008, and oral argument likely will take place in September or October 2008.[5]  Thus, we expect a decision by roughly the end of this calendar year. Second, the appeal seeks only re-sentencing.  Even if the Circuit were to remand for that purpose, this Court still would be required to consider (1) the advisory Guidelines range of 15-21 months, which defendant concedes is the correct range, see Gall v. United States, 128 S. Ct. 586, 596-97 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . .  [T]he Guidelines should be the starting point and the initial benchmark."); and (2) the remaining sentencing factors under 18 U.S.C. § 3553(a), which, as shown above, it did in the June 20 sentencing proceeding.  United States v. Edwards, 496 F.3d 677, 681 (D.C. Cir. 2007).  This Court having already explicitly found that a sentence of 15 months' imprisonment "meets the requirements of 18 U.S.C. § 3553" (6/20:25) -- i.e., is no greater than necessary to accomplish the purposes of sentencing

---

[5]     The Circuit recently scheduled oral argument for September 4, 2008.  Because that date conflicts with the undersigned's long-scheduled vacation, the government has moved to continue oral argument to a date later in September or in October.

-- there is no reasonable basis to assume that it would reach a significantly different decision on remand. Indeed, as this Court stated in rejecting defendant's request for probation: "I just cannot close my eyes to the seriousness of this offense. . . . [A] sentence of probation . . . is certainly not perceived by the public as onerous, and I don't think that it reflects the seriousness of this offense or offers adequate deterrence" (id.). Thus, defendant's appeal, even if wholly successful, is not likely to result in a sentence shorter than the expected duration of the appeal. For that reason alone, defendant's motion for release pending appeal should be denied.

In any event, defendant's claims are plainly without merit, and defendant thus has failed to raise a "substantial question" likely to result in a reduced sentence of any kind, much less a sentence so short that it would expire during the pendency of the appeal. At the outset, defendant's appeal is barred by her waiver of her appeal rights. As shown above, defendant waived her right to appeal a within-Guidelines sentence, and the sentence this Court imposed is such a sentence. Although defendant argues on appeal that she should not be bound by the waiver because, according to her, she did not agree to it "knowingly and voluntarily," the fact that this Court thoroughly explained the terms of the waiver to her at the plea proceeding strongly undercuts her argument.

-8-

As to the merits, defendant simply is incorrect that this Court treated the Guidelines range as presumptively reasonable. Although the Court noted at sentencing that, "I do give very heavy consideration to the guideline range," it then considered whether that range was appropriate in light of "18 U.S.C. 3553, . . . which sets forth many factors that I have to take into account" (6/20:22). Given the Court's careful analysis, in which it clearly discharged its duty to "filter the Guidelines' general advice through § 3553(a)'s list of factors," Rita v. United States, 127 S. Ct. 2456, 2469 (2007), its comment about the weight it accords the Guidelines reflected nothing more than an understanding of its obligation to give the Guidelines "serious consideration." Gall, 128 S. Ct. at 594.[6]

Nor was defendant's sentence substantively unreasonable.[7] To the contrary, this Court explicitly considered all the factors

_____

[6]    Defendant also relies (Motion at 4) on a comment, taken out of context, the Court made at the plea hearing, i.e., "I *start* with a presumption that [the Guidelines range] is reasonable" (4/26:15) (emphasis added).  In light of the Court's actual conduct at the sentencing hearing, the Court obviously simply misspoke at the plea hearing.  Cf. Rita, 127 S. Ct. at 2469 (holding that, even though sentencing judge erroneously referred to legal standard as whether Guidelines range was "not inappropriate," sentencing court's actions, "taken in context," made clear that it understood proper legal standard).

[7]    Appellate review for substantive reasonableness "merely asks whether the trial court abused its discretion." Rita, 127 S. Ct. at 2465.  This standard is "deferential." Gall, 128 S. Ct. at 598.

defendant claims it should have weighed differently, including defendant's acceptance of responsibility, her health, and the possibility of community confinement. As to defendant's acceptance of responsibility, the Court took that factor into account in two ways -- first, in finding that defendant was entitled to a three-point reduction in her offense level; and second, in relying on her acceptance of responsibility, along with her lack of a criminal record, to select a sentence at the bottom of the Guidelines range (6/20:21, 25). It was reasonable for the court to conclude, however, that giving greater weight to defendant's acceptance of responsibility would be inconsistent with the seriousness of the offense -- embezzling over $100,000 from her non-profit employer to finance spending sprees -- and the need for general deterrence (id. at 24-25).

As to defendant's medical condition, the court correctly observed that defendant "did not steal the money to pay for medical treatment" (6/20:24). Having rejected a causal connection between defendant's health and her almost two-year embezzlement scheme, the court reasonably concluded that defendant's medical condition did not mitigate her conduct.[8]

---

[8]    Although defendant now argues (Motion at 5) that the district court should have sentenced her to community confinement because such a sentence "would better serve [her] unique need for medical care and correctional treatment," at the sentencing hearing,

Finally, as to the possibility of a sentence of community confinement, defendant specifically requested such a sentence in her Memorandum in Aid of Sentencing (Dkt. 13), and, at the start of the sentencing hearing, the Court informed the parties that it had "read all the papers of everyone" (6/20:3). Defendant's counsel then argued for a sentence of probation that would allow defendant "to continue working . . . under a supervised regimen" (id. at 12, 14). The Court explicitly considered, and rejected, defendant's request (id. at 25). Thus, the Court obviously considered the possibility of a sentence other than incarceration.

In sum, defendant has failed to raise a substantial question of law likely to result in a sentence shorter than the expected length of the appeal.

---

defendant's counsel made no assertion that incarceration would prevent defendant from receiving adequate medical care; instead, counsel cited defendant's medical condition solely to explain her conduct (6/20:9-12).

CONCLUSION

WHEREFORE, this Court should deny defendant's motion for release pending appeal.

Respectfully submitted,

JEFFREY A. TAYLOR,
United States Attorney.

ROY W. McLEESE III,
RONALD WESLEY SHARPE,
Assistant United States Attorneys.


_____/s/_____
STRATTON C. STRAND, D.C. BAR #464992
Assistant United States Attorney
555 Fourth Street, NW, Room 8104
Washington, DC  20530
(202) 514-7088

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA
2

3    United States of America          Docket No. CR 07-0100 GK

4                                      Washington, D.C.
         vs.                           Thursday, April 26, 2007
5                                      10:22 a.m.

     Maribel A. Guillen
6

7              Defendant

8

                      Transcript of Plea
9        Before the Honorable Gladys Kessler
              United States District Judge
10

11

     APPEARANCES:
12

13   For the Government:      Ronald Sharpe, Esq.

14   For the Defendant:       Carols J. Vanegas, Esq.

15

16

17

     Reporter:                WILLIAM D. MC ALLISTER, CVR-CM
18                            Retired Official Court Reporter
                              (301) 520-1000
19

20

21

22   Reported by Voice Writing and transcribed using SpeechCAT

23

24

25   Pages 1 through 22

2

P R O C E E D I N G S

1

2       (Defendant present.)

3              THE COURT:  This is the case in the matter of the

4    United States of America versus Maribel A. Guillen.  Criminal

5    number 07-100.  Would counsel please come forward and identify

6    themselves.

7              MR. SHARPE:  Good morning, Your Honor.  Ronald Sharpe

8    for the United States.

9              MR. VANEGAS:  Good morning, Your Honor. Carlos

10   Vanegas on behalf of Ms. Guillen.

11             THE COURT:  Good morning.  Mr. Vanegas, is it correct

12   the client wants to enter a guilty plea?

13             MR. VANEGAS:  Yes, Your Honor.  That is correct.

14             THE COURT:  Do you wish to forego formal arraignment

15   this morning?

16             MR. VANEGAS:  Yes, Your Honor.

17             THE COURT:  Before we begin though, I am concerned

18   about one thing with my jury so we are just going to wait a

19   minute.

20       (Pause.)

21             THE COURT:  At this point I'm going to ask Ms.

22   Hightower to please put the defendant under oath.  And she is

23   waiving formal arraignment in this case.

24       (Defendant sworn.)

25             THE COURT:  Mr. Vanegas, does you client have any

3

1    problem with the language?

2             MR. VANEGAS:  No, Your Honor, not at all.

3             THE COURT:  Ms. Guillen, you need to talk directly

4    into the mike.  I'm sure you are nervous.  People are.  You

5    have to keep your voice up.  I want you to understand that you

6    are under oath now; and that means that if you don't answer my

7    questions truthfully, you could be prosecuted for perjury.

8             Do you understand that?

9             THE DEFENDANT:  Yes.

10            THE COURT:  Have you received and read the letter

11   between Mr. Sharpe and Mr. Vanegas, I think it was Mr. Sharpe,

12   yes.  And the statement of the offense that is attached to it.

13   Have you seen the documents?

14            THE DEFENDANT:  Yes.

15            THE COURT:  I want to call your attention in the

16   beginning to something important and that is in the very first

17   paragraph.  No, it is not in the first paragraph.  I'm sorry.

18   Give me a minute.

19            Mr. Vanegas, where is the provision in which your

20   client is waiving her Rule 11 rights?  Not all of her Rule 11

21   rights.  Here it is.  Paragraph 5.

22            Paragraph 5.  This is written in very legal language

23   but I want to put it in much simpler language for you.

24   Ordinarily when a person comes into court and enters a plea of

25   guilty whatever they say during that proceeding cannot be used

4

1    against them in a later criminal proceeding or for that matter

2    in a later civil proceeding.

3         In this paragraph, number 5, you are giving up that

4    right and that protection and what this means is that anything

5    you say today could be used against you at a later time.  For

6    example, if you decide today that you don't want to go forward

7    but you have already talked to me about the offense in the

8    case, anything that you will have said could be used against

9    you.

10        Do you understand that?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Have you discussed that with Mr. Vanegas?

13        THE DEFENDANT:  Yes.

14        THE COURT:  All right.  The purpose of our hearing

15   this morning is for you to decide whether you want to enter a

16   guilty plea or whether you want to go to trial.  That decision

17   is an important one and it is up to you and you alone.  You

18   have to make it voluntarily.  You have to make it of your own

19   free will and you have to understand what rights you will be

20   giving up and I will be explaining that to you.

21        I suspect that Mr. Vanegas has already explained

22   those things to you but I want to make sure that you really do

23   understand them.  If at any time you have any questions, you

24   should feel free to ask them either of your lawyer or of me.

25   It doesn't matter.

5

1          How old are you please?

2          THE DEFENDANT:   I will be 27 on May 12.

3          THE COURT:   How far did you finish in school?

4          THE DEFENDANT:   College.

5          THE COURT:   You have a B.A.?

6          THE DEFENDANT:   Yes.

7          THE COURT:   Were you born in D.C.?

8          THE DEFENDANT:   No.

9          THE COURT:   Where?

10         THE DEFENDANT:   Torrance, California.

11         THE COURT:   You are a U.S. citizen though?

12         THE DEFENDANT:   Yes.

13         THE COURT:   In the past 48 hours have you taken any

14   alcohol or drugs?

15         THE DEFENDANT:   I had a glass of wine last night.

16   That was it, and prescription medication for my illness.

17         THE COURT:   Do you feel that that would in any way

18   cloud your judgment today?

19         THE DEFENDANT:   No.

20         THE COURT:   Are you taking any medications that could

21   affect your ability to concentrate this morning?

22         THE DEFENDANT:   No.

23         THE COURT:   Have you ever had any kind of treatment

24   for emotional problems or mental-health problems?

25         THE DEFENDANT:   I have been diagnosed with depression

6

1   since 2000.

2           THE COURT:  Are you taking medication for that?

3           THE DEFENDANT:  Yes.

4           THE COURT:  What are you taking?

5           THE DEFENDANT:  I take Cymbalta for it.  It is also

6   for the fibromyalgia as well.

7           THE COURT:  Does that medication either make you

8   sleepy or foggy in any way?

9           THE DEFENDANT:  No.

10          THE COURT:  Are you satisfied with the Mr. Vanegas'

11  services?

12          THE DEFENDANT:  Yes, I am.

13          THE COURT:  Have you had enough time to go over the

14  facts with him, to talk about the charges with him and to

15  really discuss whether this is what you want to do today?

16          THE DEFENDANT:  Yes, I have.

17          THE COURT:  At this point I want to go over with you

18  what your constitutional rights are.  I want you to keep in

19  mind as we go through them that if you decide to plead guilty

20  today, you are going to be giving up the rights that I'm going

21  to explain to you.

22          The first right that you have that you will be giving

23  up is the right to have your case presented to a grand jury.  A

24  grand jury hears from the government and a grand jury is

25  composed of a group of D.C. residents, at least 26 sometimes

7

1    less than that.  Actually sometimes 23.  And those residents

2    and citizens of the District of Columbia decide whether the

3    government has shown that there is probable cause to believe

4    that you committed this offense.

5           If the government can't even meet that very low

6    standard and the grand jury refuses to issue an indictment,

7    then the government can't prosecute you.  So that the grand

8    jury serves as a first line of screening and protection for

9    citizens.

10          In this case because you are coming into court very

11   early, the government has not presented any evidence to the

12   grand jury and there has been no finding of probable cause.  Do

13   you understand that?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Of course you have the right to plead not

16   guilty and you have the right to a jury trial.  If you had a

17   trial, your lawyer and the government would select the jurors.

18   There would be 12.  They would sit in that jury box over there.

19   They would all be D.C. residents and citizens.  They are the

20   ones who would make the final decision about whether the

21   government proved beyond a reasonable doubt that you had

22   committed these offenses.

23          You would have a right to counsel.  It would be Mr.

24   Vanegas or perhaps someone in his office if he was unavailable.

25   Your lawyer would protect you and would defend you at trial.

8

1   Above all your lawyer would have the right to cross-examine or

2   question the government witnesses.  That would be done so as to

3   raise doubts in the jury's mind about those government

4   witnesses.  Was their testimony accurate, was it complete, did

5   they really see or hear whatever it was they were testifying

6   about, where they biased against you in anyway?

7          You would have the right to present your own

8   witnesses.  We could subpoena them which means a court order

9   telling them to come in to testify.  If they didn't obey it, I

10  could even send a marshal out to bring them in.

11         You would have the right to testify as well if you

12  wanted to do.  You would also have the right to remain silent,

13  and that's very important.  I would tell the jury at least

14  twice that they couldn't hold it against you in anyway if you

15  decided not to testify.  They couldn't think for example that

16  you were guilty because you choose to remain silent.

17         I would also tell the jury again at least twice that

18  they had to presume that you were innocent and they would have

19  to keep that presumption of your innocence in their minds until

20  they were convinced beyond a reasonable doubt that the

21  government had proven you were guilty.

22         If the verdict of the jury was a guilty one, you

23  could take an appeal.  You would have a lawyer to represent

24  you.  You would go to a higher court called the U.S. Court of

25  Appeals for the D.C. Circuit and you would be arguing that the

9

1    jury had made some kind of fundamental mistake or I had made

2    some kind of mistake in running the trial.  If you decide to

3    plead guilty today, there is to trial, no testimony, no cross-

4    examination, no appeal.  You give up all of that.

5            Do you understand that?

6            THE DEFENDANT:  Yes, I do.

7            THE COURT:  Do you agree to that?

8            THE DEFENDANT:  Yes.

9            THE COURT:  One thing I want to explain and that is

10   that you would always have the right to take an appeal if you

11   thought my sentence was illegal.  And that's very important.

12           I want to talk with you about the statement attached

13   to the plea letter.  It is called the statement of the offense

14   and it is, as you know, several pages long.  It is a full four

15   pages.  Have you read it carefully?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Do would you agree with it?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Is there anything that you think you is

20   wrong in it?

21           THE DEFENDANT:  No.

22           THE COURT:  I want to go over the major points in

23   that statement.  You were employed by a nonprofit organization

24   called the International Intellectual Property Institute for

25   about not quite two years.  Is that correct?

1          THE DEFENDANT:  Yes, that is correct.

2          THE COURT:  You were responsible for all the

3    financial accounting of the organization.  Is that right?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And in that position you maintained the

6    checkbook.  You maintained the petty cash account.  You

7    processed the payroll and you paid the organization's expenses.

8    Is that all correct?

9          THE DEFENDANT:  Yes.

10         THE COURT:  You had an organizational or corporate

11   credit card to pay those expenses, is that right?

12         THE DEFENDANT:  Yes.

13         THE COURT:  The organization had two checking

14   accounts.  One was at Wachovia Bank and at, well, I think the

15   organization only had an account at Wachovia, is that correct?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Of course, you had access to that

18   account?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Is it also correct that the organization

21   used VISA credit cards in its own organizational name and that

22   you were allowed to use those credit cards in order to pay the

23   expenses of the organization and running itself?

24         THE DEFENDANT:  Yes.

25         THE COURT:  You had two accounts, you had two

11

1    personal checking accounts.  One at the Bank of America and one

2    at Wachovia Bank, is that right?

3              THE DEFENDANT:    That is right.

4              THE COURT:  Is it also correct that you were the sole

5    signatory on both of those accounts?

6              THE DEFENDANT:  Yes.

7              THE COURT:  As I understand it and you correct me if

8    I am wrong, sometime in December of 2004 shortly after starting

9    your employment, you began to prepare and sign checks written

10   on the organization's business operating accounts which you

11   made payable to yourself or to petty cash and you used a rubber

12   stamp with the signature of the organization's chairman to

13   endorse those checks.  Is that correct?

14             THE DEFENDANT:  Yes.

15             THE COURT:  And then you negotiated those checks.

16   You either cashed them or you deposited them into your checking

17   accounts at either Bank of America or Wachovia, is that

18   correct?

19             THE DEFENDANT:  Yes.

20             THE COURT:  So in essence you stole that money from

21   the organization, is that correct?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Is it also correct that you used the

24   organizations VISA credit card to charge all sorts of personal

25   expenses to the organization and that you got cash advances as

12

1    well and convenience checks made payable to yourself by using

2    those VISA cards, is that right?

3              THE DEFENDANT:  Yes.

4              THE COURT:  As a result of all of that activity with

5    the VISA cards, you received a lot of personal items,

6    merchandise, cash advances, and the convenience checks that you

7    ultimately either cashed or deposited, is that correct?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Is it also true that when you were first

10   questioned by the organization's executive director who had

11   been alerted that there was some kind of a problem with the

12   accounts, that you lied and you said that you were trying to

13   secure a payroll advance and this was the only time you had

14   ever attempted to write and cash a check on the organizations

15   operating account without permission or authorization, is that

16   correct?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And then of course upon request you

19   resigned from the organization on January 20, 2006, is that

20   right?

21             THE DEFENDANT:  Yes, that is right.

22             THE DEFENDANT:  Is it also true that in March of 2006

23   you met with the organization's president and chief executive

24   officer.  You admitted to the conduct I've already discussed

25   and on August 30, 2006 you provided a statement to FBI agents

13

1    also admitting to that conduct, is that all correct?

2              THE DEFENDANT:  That is correct.

3              THE COURT:  Mr. Vanegas, are these facts consistent

4    with your investigation as well?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Does the government have any concerns

7    about the factual basis?

8              MR. SHARPE:  No, Your Honor.

9              THE COURT:  At this point I want to go over the plea

10   letter with you and make sure that you do understand it.   In

11   paragraph 1, you are agreeing to waive or give up the grand

12   jury indictment and we've talked about that, and you would be

13   pleading guilty to one count of wire fraud.   Do you understand

14   that?

15             THE DEFENDANT:  Yes, I do.

16             THE COURT:  I want to talk about sentencing with you.

17   I do not at this moment have any idea of what my sentence will

18   be.   I will get a presentence report in about 70 days.   If it

19   is erroneous in any way, your lawyer will have a chance to

20   object to it.   The government also has a chance to object if

21   they think it's erroneous.

22             I will in that presentence report get calculations on

23   what the sentencing guideline range is and I will talk about

24   that with you in a minute.

25             What I need to tell you today though is what the

14

1  maximum statutory sentence is that I would have the authority

2  to impose.  That doesn't mean I will be giving you that

3  sentence but you do have to know the worst that could happen to

4  you.  Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  For wire fraud I could impose a maximum

7  sentence under the statutes of 20 years.  I could fine you

8  $250,000 or twice the amount of loss in this case.  I must

9  impose $100 special assessment.  That's the only thing I can

10 tell you for sure.  I could impose an order of restitution that

11 you pay back the money and I could impose a three-year term of

12 supervised release.

13          Do you understand that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  The plea agreement indicates that, and

16 I'm still on paragraph 2 and I'll be talking about paragraph 2

17 and 3 at this point.  The plea agreement indicates that I will

18 be considering what are the advisory sentencing guidelines.  I

19 am not bound by those guidelines although I certainly must and

20 will consider them.  If you receive a sentence that is greater

21 than that provided in the guideline range or if you are unhappy

22 with my sentence for any reason, that does not allow you to

23 withdraw your guilty plea.  Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Let's talk about the sentencing

15

1  guidelines.  They are advisory, but as I say, I certainly look

2  to them initially.

3           Counsel, is everybody in agreement that the range in

4  this case would be 15 to 21 months?

5           MR. SHARPE:  Yes, Your Honor.

6           MR. VANEGAS:  Yes.

7           THE COURT:  Counsel on both sides are experienced.

8  They have calculated your guideline range at 15 to 21 months.

9  Again I will hear from probation in the presentence report

10  about how they calculate the range and that may be the same or

11  it may be different.

12          Our Court of Appeals has ruled that any sentence

13  within the guideline range is presumed to be reasonable.  There

14  may be reasons that your counsel could prove to me that it was

15  not reasonable but basically I start with a presumption that it

16  is reasonable.

17          The government recognizes at the very end of

18  paragraph 3 that you may argue what I just said, namely that

19  the guideline range is not reasonable and at sentencing your

20  lawyer can argue that I should impose a sentence below the

21  recommended guideline range but that of course will be up to me

22  to decide.

23          In paragraph 4, you agree that either at the time of

24  sentencing or before you will pay your $100 special assessment.

25  Do you understand that?

16

1      THE DEFENDANT:  Yes.

2      THE COURT:  And most importantly you agree to pay

3  restitution in the amount of $107,208.31.  Do you agree to

4  that?

5      THE DEFENDANT:  Yes.

6      THE COURT:  Paragraph 5 I've talked to about.

7  Paragraph 6 mere says that the government reserves its right to

8  speak at sentencing.  And of course your counsel will have a

9  right to speak at sentencing and you have a right to speak at

10  sentencing.

11      The government does make clear in that same paragraph

12  that it does not intend to file any motion, and it is called a

13  5K.1 motion, asking me to depart downward below the guideline

14  range.  So the government is not going to ask me to do that.

15  You remain free to ask me to do it, and again I will weigh all

16  the arguments.

17      Do you understand all that?

18      THE DEFENDANT:  Yes.

19      THE COURT:  Paragraph 9.  The government agrees that

20  today it will not oppose your release pending sentencing.  That

21  doesn't bind me.  I want you do understand that.  I will

22  certainly take it into account and consider it.  But I will

23  make the decision about your release pending sentencing.

24      The government also agrees that at sentencing it will

25  not oppose your voluntary surrender, and what that means is

17

1    that at sentencing rather than detaining you and incarcerating

2    you right away so that you go to the D.C. jail, the government

3    will not oppose your being allowed back into the community

4    until the Bureau of Prisons designates the specific prison to

5    which you will have to report.

6          Again that will be my decision whether you will be

7    immediately incarcerated or not but I certainly will take into

8    account what the government's position is.  Do you understand

9    that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Paragraph 9 also states that in the

12    calculation of the advisory guidelines you are getting credit

13    for coming in early with this guilty plea in terms of its

14    calculations.

15          Paragraph 10 essentially says what I've been telling

16    you, that I am not obligated to follow any recommendation of

17    the government and that the final decision regarding bond

18    status and detention will be made by me.

19          Paragraph 11 indicates that if you fail to comply

20    with any of the provisions of this plea agreement, then the

21    agreement is broken and no longer exists and the government can

22    go ahead and prosecute you fully in any way it thinks

23    appropriate.

24          Do you understand that?

25          THE DEFENDANT:  Yes.

18

1    THE COURT:  I do want to talk about paragraph 13.

2    As I understand this, Mr. Vanegas, and this paragraph

3  is a little bit different than the usual one, your client is

4  giving up her right to appeal any sentence she receives unless

5  I sentence her to a period longer than 20 years or unless I

6  depart upwards from the guideline range.  Is that correct?

7    MR. VANEGAS:  Yes, Your Honor.

8    THE COURT:  Do you think you understand what that

9  means?

10    THE DEFENDANT:  Yes.

11    THE COURT:  All right.  I told you a while ago I

12  could never give you, excuse me, that you would always have the

13  right to take an appeal if you thought my sentence was illegal.

14  If I gave you more than 20 years which is the maximum under the

15  statute, that of course would be illegal and he would always

16  have a right to take an appeal.  In addition you are retaining

17  the right to appeal if I go above the guideline range.

18    That is a fairly long plea agreement.  Do you have

19  any questions you want to ask me about it, either about the

20  sentencing which is always very complicated or about any of

21  your constitutional rights?

22    THE DEFENDANT:  No, thank you.

23    THE COURT:  Has anybody in any way at all tried to

24  pressure you or force you to enter this guilty plea?

25    THE DEFENDANT:  No.

19

1          THE COURT:  Has anybody tried to tell you that they

2    knew what sentence I would give you?

3          THE DEFENDANT:  No.

4          THE COURT:  Do you understand that Mr. Vanegas and

5    Mr. Sharpe have negotiated, talked about and discuss what the

6    terms of this guilty plea will be?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Has anybody made you any promises other

9    than the promises that are contained in that written letter?

10         THE DEFENDANT:  No.

11         THE COURT:  Has anyone suggested that you will get a

12   lighter sentence simply because you are entering a guilty plea

13   today?

14         THE DEFENDANT:  No.

15         THE COURT:  Are you ready to make a decision at this

16   time?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Are you entering this guilty plea

19   voluntarily and of your own free will today?

20         THE DEFENDANT:  Yes, I am.

21         THE COURT:  What is your final decision?  Do you want

22   to go to trial in this case or do you want to enter a plea of

23   guilty to one count of wire fraud?

24         THE DEFENDANT:  I will enter a plea.

25         THE COURT:  The court will accept the guilty plea.

20

1   There's absolutely no question at all about the factual basis

2   for it.   I think that the defendant, although soft-spoken and

3   very nervous probably, that she is fully competent to make the

4   decision and that she understands what she's doing and the

5   consequences of it, and therefore, the plea will be accepted.

6           I have the bail agency report.   And as I understand

7   it, the defendant has no criminal record, is that right?

8           MR. VANEGAS:   That is correct, Your Honor.

9           THE COURT:   The government of course is not opposing

10  her release pending sentencing and that will be granted and let

11  me set dates for the future.   The presentence report will be

12  due June 15.   Sentencing, if you all look at your calendars

13  please, I could do it the following week on the 21st in the

14  afternoon if counsel are available.

15          MR. VANEGAS:   Yes, Your Honor.

16          MR. SHARPE:   Your Honor, that is fine for the

17  government.   If we could do the 20th that would be fine.

18          THE COURT:   The 20th.

19          MR. SHARPE:   In the afternoon is better.

20          THE COURT:   Mr. Vanegas?

21          MR. VANEGAS:   That is fine, Your Honor.

22          THE COURT:   At 4:15 p.m. please, let's say 4:30 p.m.

23  And all sentencing memoranda must be filed.   I'm going to

24  require the presentence report a little bit earlier by June 10.

25  Then all memoranda should be filed by five o'clock on the 18th

21

1    of June.

2            The conditions of release include the requirement

3    that the defendant maintain employment.  She is to check-in

4    weekly by phone with pretrial services.  She is to have a drug

5    test today; and if the test is negative, I will leave it up to

6    the discretion of pretrial whether any further testing is

7    required.  Of course there must be no further criminal conduct.

8            Do you understand those conditions?

9            THE DEFENDANT:  Yes, I do.

10           THE COURT:  Anything further from counsel?

11           MR. VANEGAS:  Yes, Your Honor, one brief request.

12   That would be if the court would allow Ms. Guillen to visit her

13   mother in California for the Mother's Day weekend.  The travel

14   dates would be May 10 through May 15.  She's a lifelong

15   resident of California.  That's where she went to high school

16   and to college.  This trip had been planned and she is very

17   close with her mother so she would like to be able to do that.

18           THE COURT:  Any objection from the government?

19           MR. SHARPE:  No, Your Honor.

20           THE COURT:  That may be allowed.

21           THE CLERK:  Could Mr. Vanegas submitted an order to

22   the court including those dates?

23           MR. VANEGAS:  That is fine, Your Honor.  I will do

24   so.

25           THE COURT:  You should do that please.

22

1          Mr. Sharpe.

2          MR. SHARPE:  The government would have one request,

3  and that is to sign a booking order.  I have already shown it

4  to defense counsel.  That is so that Ms. Guillen can be booked

5  today and I will pass it up.

6          THE COURT:  All right.  The parties may be excused at

7  this point.

8      (Proceedings concluded at 11:03 a.m.)

9                    CERTIFICATE OF REPORTER

10      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

11  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

12

13  *[signature]*

14  WILLIAM D. MCALLISTER
    RETIRED OFFICIAL COURT REPORTER        COPY

15

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    .    DOCKET NUMBER:  CR 07-100

     vs.    .    Washington, D.C.
                     .
MARIBEL A. GUILLEN,    .    June 20, 2007
                   .    4:30 p.m.
        Defendant.    .
. . . . . . . . . . . . . .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE
A UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:    RONALD WESLEY SHARPE, ESQUIRE
UNITED STATES ATTORNEY'S OFFICE
555 4th Street, NW
Washington, D.C.  20530
(202) 353-9460
(202) 307-3569 (fax)
ronald.sharpe@usdoj.gov

FOR THE DEFENDANT:    CARLOS J. VANEGAS, ESQUIRE
FEDERAL PUBLIC DEFENDER
625 Indiana Avenue, NW
Suite 550
Washington, D.C.  20004
(202) 208-7500
(202) 208-7515 (fax)
carlos_vanegas@fd.org

2

THE COURT REPORTER:        SUSAN PAGE TYNER, CVR-CM
                           Official Court Reporter
                           United States District Court
                           333 Constitution Avenue, N.W.
                           Room 6429
                           Washington, D.C.  20001
                           (202) 371-2230
                           susantyner@verizon.net


Computer aided transcript prepared with the aid of
SpeechCAT.

3

```
 1                  P R O C E E D I N G S

 2            THE COURT:  Good afternoon.  I am sorry we are

 3   starting late.  This is United States versus Maribel

 4   Guillen, criminal action 07-100.

 5            Would counsel please identify themselves for the

 6   record.

 7            MR. SHARPE:  Good afternoon, Your Honor. Ronald

 8   Sharpe for the United States.

 9            MR. VANEGAS:  Carlos Vanegas for the defense.

10            THE COURT:  For probation, do we have probation?

11            THE PROBATION OFFICER:  Good afternoon, Your

12   Honor.  Kelly Kraemer.

13            THE COURT:  This is here for sentencing today.  I

14   have read all of the papers everyone, I can assure you.  Let

15   me hear from the government first, please.

16            MR. SHARPE:  Thank you, Your Honor.

17            Your Honor, as you know the defendant pled guilty

18   to one count of wire fraud in connection with eliciting a

19   fraudulent scheme to obtain money from the IIPI, which is

20   the International Intellectual Property Institute.

21            From the period of time the defendant, in the

22   government's view, abused her position of trust and caused

23   harm to obviously IIPI, but that harm also affects everyone,

24   Your Honor.
```

4

1          Everyone who has used checks, who has used

2   credit cards, and that harm has an associated cost in the

3   form of higher interest rates, higher security costs and the

4   like.

5          THE COURT:  I have a question about what you

6   attached to your memorandum, or maybe probation attached to

7   it, I am not sure.

8          The gentleman who gave statements on behalf of the

9   International Intellectual Property Institute indicated that

10  they -- it is not well worded at all.  It makes it sound as

11  if he is personally stating that he has lost $99,416.40, and

12  that he personally is entitled to restitution in that

13  amount.

14          Number one, I assume since he has signed both the

15  victim impact statement and this declaration that he is

16  signing on behalf of the organization, and speaking on

17  behalf of the organization.

18          Is that correct?

19          MR. SHARPE:  That is, Your Honor.

20          THE COURT:  My second question is, there is a

21  discrepancy in the amount.  He says he is entitled to

22  restitution of $99,416, et cetera, whereas probation uses

23  the figure of 107,208.31.

24          What is that discrepancy?

25          MR. SHARPE:  Indeed there is a discrepancy, and

5

1  that is primarily due to the investigation and what we

2  turned up.  It was also with the significant insistence of

3  Ms. Guillen herself, Your Honor.

4          I'm getting a little ahead of myself.

5          THE COURT:  What is the government's view as to

6  what is the correct figure?

7          MR. SHARPE:  It is the $107,208.31.

8          THE COURT:  That is the government's view?

9          MR. SHARPE:  Yes.

10          THE COURT:  My final question -- I actually had

11  two -- three not two.

12          Is it correct that the organization has been

13  reimbursed by insurance, and so therefore the restitution

14  would have to be made to whatever insurance company -- no,

15  wait a second.  I am misreading this.  He has not gotten

16  insurance.

17          MR. SHARPE:  That is my understanding, Your Honor.

18          THE COURT:  All right.  I misread that.  Go ahead,

19  please.

20          MR. SHARPE:  Well, Your Honor, given the hour I do

21  not want to be long, but I do want to make a few points

22  here.

23          Obviously it is a serious conduct.  The illicit

24  conduct conducted by the defendant is serious, and it

25  requires an appropriate punishment, Your Honor.  In the

6

1  government's view that would be a guideline sentence in the

2  range of 15 to 21 months as suggested by the United States

3  Sentencing Guidelines.

4        I do want to emphasize a few points.  This is a

5  bit of a different case.  To ensure that the court is aware,

6  and I did put it in our factual section in my motion to the

7  court -- I'm sorry, my memorandum in aid of sentencing, but

8  in my experience, Your Honor, you often hear about

9  defendants who are similarly situated to Ms. Guillen as

10  their illicit conduct being an aberration.  They always

11  intended to pay the money back and so forth.  Those things

12  always rang hollow.

13        Ms. Guillen's situation is a bit different I would

14  say, because she did things that are significant in terms of

15  she kept track of all of the moneys.

16        THE COURT:  I saw that.  She had a spreadsheet.

17  Is that right?

18        MR. SHARPE:  That is, Your Honor.  That truly --

19  that coupled with she maintained the bank statements and the

20  canceled checks and also the credit card statements involved

21  in her fraud.

22        Those things coupled together actually helped us

23  come up with the figure of the 107 and some odd thousand

24  dollars.  It was only through her efforts and her

25  coordination with the management at the Intellectual

7

1   Property Institute and also law-enforcement, members of the

2   FBI and the US Attorney's Office, that we were able to learn

3   of some of the loss that otherwise would not have been

4   discovered I believe Your Honor.

5           So I want to make that point and make sure the

6   court is aware of that in fashioning an appropriate sentence

7   for Ms. Guillen.

8           THE COURT:  Don't you think the fact that she kept

9   a spreadsheet on what she was stealing is out of the

10  ordinary?

11          MR. SHARPE:  I do, Your Honor.  I do.  In this

12  sense I think it speaks to her intent to actually pay the

13  money back.  I think that in most cases that we see, or

14  certainly that I've seen personally, defendants may start

15  off -- especially embezzlement cases.

16          They may start out stealing a bit of money, notice

17  no one is looking, they can get away with it and then the

18  stealing gets increased over time.  They get bold and they

19  finally get caught.

20          Apparently from day one Ms. Guillen kept track of

21  the money every time that she had stolen from the IIPI.  The

22  only thing that makes sense to me, because obviously if you

23  are caught with that that is very incriminating, is that she

24  truly indeed intended to pay it back at some point.

25          I have not seen anything to rebut that.  I had the

8

1    benefit of meeting Ms. Guillen in a debriefing, and she

2    impressed me as somebody who did indeed make a mistake in

3    her life, a very significant one, and like I said, it is

4    serious conduct.

5            It occurred over a period of time.  It is not a

6    one-time incident.  There are a number of transactions

7    involved, and that is why the government is requesting the

8    sentence we are requesting in our papers.  That is the

9    guideline range.  We were asking for something at the lower

10   end of it.

11           I want to put on the record that we are moving for

12   a three-level decrease in her offense level because of her

13   acceptance of responsibility, and I think that concludes the

14   government's proffer in this case.

15           THE COURT:  Thank you.  Mr. Vanegas.

16           MR. VANEGAS:  Thank you, Your Honor.

17           I agree with the government with respect to the

18   fact it was a very serious conduct and that it does require

19   a sanction, an appropriate sanction.

20           I depart with the government whether it is the

21   type of conduct in looking at the totality of Ms. Guillen's

22   embezzlement in the context of her record-keeping and the

23   amount of money that she took, and also the context of her

24   life, and what she had done and accomplished prior to

25   embezzling the money.

9

1          What we do know is that Ms. Guillen is a first-

2     time offender.  Prior to the incident offense she had never

3     been arrested or charged with a criminal offense.  In fact

4     Ms. Guillen has been the pride and joy of her grandparents,

5     of her mother and father.

6          They are immigrants who came into the country to

7     provide for them the opportunity they could not provide in

8     Mexico.  Ms. Guillen succeeded at every level.  The school

9     that she attended, the high school, the California Academy

10    Math and Science is a competitive school.

11         I know that because it is close to where my mother

12    lives.  I know my siblings could not be admitted to that

13    school, because it takes a lot of talent to be admitted

14    there.  Ms. Guillen succeeded, and to the extent that she

15    then went to UCLA, and at UCLA she took on another language.

16    She is fluent in French.  So there is a lot in Ms. Guillen's

17    background that is inconsistent with the behavior that we

18    see taking place in late 2004.

19         What makes this case extraordinary, out of the

20    ordinary, is the health crisis that she was experiencing.

21    One document that is very significant, and I apologize to

22    the court that I did not provide the documents that I

23    submitted to the parties, is that in October 6, 2004 she has

24    a meeting with a doctor.

25         Basically the way he describes it he says, I had a

10

```
 1   discussion.  I told Ms. Guillen that there was the
 2   possibility that she had primary pulmonary hypertension,
 3   which is no different than essentially telling someone that
 4   you have a severe type of cancer, because it is a rare
 5   disease.
 6         It is difficult to treat, and here she was a
 7   young woman who just made the transition from California to
 8   come to D.C. and basically feeling she was going to start
 9   her life anew after leaving Los Angeles and being able to
10   leave Los Angeles knowing that her mom's health had
11   stabilized.
12         So we see now for the next year Ms. Guillen going
13   to different doctors, going to different experts and no one
14   is able to identify or accurately diagnose the illness that
15   she is suffering.
16         THE COURT:  She did have health insurance, did she
17   not?
18         MR. VANEGAS:  Yes, she did.  Unfortunately she got
19   the health insurance through the company.
20         THE COURT:  Right.
21         MR. VANEGAS:  But her reality basically was
22   condensed to the physical aspect of her life of walking two
23   or three blocks and being short of breath, not being able to
24   go beyond that.  Also having migraines and being fatigued
25   and just not knowing what was going on with her life.
```

11

1          Around this time is when she starts behaving in

2    this way, which is totally out of character.  There is no

3    simple explanation, Your Honor.

4          THE COURT:  What did she use the money for?  If

5    she had health insurance and she is not a drug addict --

6    there is nothing to suggest that there were people in her

7    life taking advantage of her.  What did she use the money

8    for?

9          MR. VANEGAS:  From what I know, Your Honor, a lot

10   of money went into spending sprees of clothing.  A lot --

11   some money went into buying things for her mother.  Money

12   went into things like a very high quality laptop.

13          She also bought herself, from what I can see in

14   the documents and record-keeping, she bought membership to

15   a gym, even though she was not able to go to the gym, and

16   she made -- she enrolled at one of the pricier gyms, and she

17   did that on a number of occasions, even though she could not

18   go.

19          I do know that she also did buy some medications,

20   because there were co-payments for some medicines, but

21   other medicines that she could not pay on her own salary.

22   Sometimes she would pay for rent.  Sometimes for her food.

23   And then those are the types of expenditures that I'm aware

24   of, Your Honor.  But truly I cannot say that somehow you get

25   to the number that you reach.

1          But from what I see, clearly she was not living

2    the lifestyle that she was going out and partying and

3    hanging out, because she could not.    Physically she was

4    basically homebound.    She could not go far without

5    experiencing fatigue.

6          Once she gets home she is basically an insomniac,

7    so she could not really sleep well.    So all of that is going

8    on at the same time that she is embezzling from the

9    employer.

10          Your Honor, this represents clearly the most

11    painful and lowest point in her life.    The conversation

12    that she had with her mother was very painful, to the point

13    that her mother basically took on the guilt saying, how did

14    I go wrong in not being able to know what was happening to

15    you?

16          Ms. Guillen has persevered through other problems,

17    and I think that that is noted in the report I submitted to

18    the court.    There have been personal traumas, and she has

19    always been able to persevere and to overcome these

20    obstacles.

21          I believe that is why a sentence of probation is

22    appropriate here is for a number of factors.    One is the

23    extraordinary level of acceptance of responsibility which

24    Mr. Sharpe has outlined in the sentencing memorandum, and I

25    will not go into that.

13

1          But on another level the post-offense

2    rehabilitation that she has been able to do on her own.  She

3    lives in the District of Columbia without any family.  Her

4    mom is struggling with her own illness.  One sister is

5    basically -- she does not work.  She basically takes care of

6    the family home.

7          THE COURT:  That is the older sister who had been

8    raped earlier, is that correct?

9          MR. VANEGAS:  That is correct, and there is a

10   younger sister in college.  She is out here on her own, and

11   she was in the situation where she was terminated for the

12   job, appropriately so.

13          She had no income, and then her mother is

14   basically subsidizing her, which brings me to another point,

15   and that is Ms. Guillen knew that all of this was coming to

16   the front, that she was in big trouble, that she had taken

17   all of this money that did not belong to her, and she did

18   not leave.

19          Basically she stayed in D.C., and when the problem

20   came to her when she was being investigated she basically

21   was forthright and told everyone who was in a position of

22   wanting to know what happened.

23          She told them everything.  She did not leave the

24   jurisdiction.  She stayed here and faced her problem.  She

25   now has found gainful employment, and based on the

14

1  performance evaluation we now see what the real Ms. Guillen

2  is, what she is capable of doing.

3          She is someone who was willing to do the extra

4  amount of work, who was willing to do overtime, who gets

5  along with all of her peers, who takes criticism, who can

6  work independently, and who basically provides a

7  substantial windfall for the company when they have work

8  that needs to be translated, because she is bilingual.  So

9  she can take that work and basically save the money, a

10  substantial amount -- save the company a substantial amount

11  of money.

12          In that evaluation they've indicated they want her

13  to take courses, and they will pay for those courses.  It is

14  a great fit for her.

15          She is very happy, and I think the best type of

16  rehabilitation that the court can do, that society can

17  provide Ms. Guillen, is the ability to continue working, to

18  be under a supervised regimen that allows her to know that

19  while you can continue to work, but you have to report to

20  you probation officer.

21          You have to provide a monthly accounting of your

22  finances, and whatever other conditions are appropriate, and

23  she has to maintain work.  And clearly having to make

24  restitution payments is significant.

25          When you put all of these components in a

1  sentencing, Your Honor, that is significant.  Clearly it is

2  not a slap on the wrist where she feels that she is going

3  away -- that somehow she got away with something.  Far from

4  that.

5          She is ashamed of herself, and she has had a

6  conversation with her mother and her father on Father's Day.

7  That was the first time she spoke to him, and he basically

8  said to her, you know, you're still daughter.

9          THE COURT:  Does he know now?

10         MR. VANEGAS:  He now knows, and he learned because

11  when her mother was hospitalized again on account of the

12  leukemia -- all of this has taken place at about the same

13  time.

14         So the parents support her, but it is very

15  difficult for her.  This is someone who had always been a

16  shining star for them, and now she has herself into a lot of

17  trouble.

18         She wants to go out and be in the community and be

19  able to show her appearance, the court, the government that,

20  in fact, she can be a productive citizen, that she can do

21  the right thing, and she will try as best as she can to make

22  that company whole, and that is by making those restitution

23  payments.

24         I think that Ms. Guillen has shown an

25  extraordinary amount of resilience and perseverance in not

1   being completely brought down by what she has imposed upon

2   herself, and that is being able to stand up, and get

3   employment, and do the best she can, and basically impress

4   her employer to the level they want to keep her, and they

5   want to assist her in basically learning more so that she,

6   in turn, can help the company.

7          For those reasons, Your Honor, I think that a

8   sentence of probation is appropriate.  In getting to know

9   Ms. Guillen I do believe that she will be a success in

10  probation.

11         I have had two or three other cases in this

12  courthouse where the defendants -- they have committed a

13  crime, but there is something in their background and their

14  commitment to work and to family which I think is paramount

15  and stands out.

16         They were sentenced to probation and they did not

17  let down, they have not led down the court, and I strongly

18  feel that Ms. Guillen will never commit another crime in the

19  rest of her life, and for the rest of her life she will know

20  that there is a conviction on her record.

21         Any time that she applies for a job she is going

22  to have to write in or check in that she has a felony

23  conviction.  She will be excluded for certain employment.

24  She will not be able to vote, and the stigma of being a

25  convicted felon is significant and something that will stay

1    with her for the rest of her life.  It is not a mere smack

2    on the wrist.

3         If the probation officer writes a probation

4    report, we will be back here, and the court then can

5    sanction her and give her the 15 or 17 months that the

6    guidelines call for.  But under the statute, and

7    specifically 3553(a), I believe there is a basis to impose

8    probation.

9         One thing that I forgot to mention, Your Honor, is

10    28 U.S.C. 994(j), and basically it is a provision where it

11    is telling the Sentencing Commission that a first-time

12    offender actually should -- that person can receive a

13    sentence of probation, and a first-time offender who does

14    not commit or has not been convicted of a crime of

15    violence.

16         I have tortured the language here, but it is right

17    in the U.S. code, and I believe that between what Booker

18    allows for the court and what these various statutes that I

19    have outlined provide that there is a basis to impose a

20    sentence of probation, and I believe Ms. Guillen will follow

21    through, and will never see her in this type of situation

22    again.

23         THE COURT:  All right.  Ms. Guillen, would you

24    come forward, please.

25         (Defendant complied.)

1        THE COURT:  How do you pronounce your name?

2        THE DEFENDANT:  Guillen.  It is pronounced

3   Guillen, Your Honor.

4        THE COURT:  This is your sentencing day.  You have

5   the right to speak today.  I know people get very, very

6   nervous, understandably.  So you are not required to speak,

7   but certainly if you wish to say anything, I am more than

8   happy to hear from you today.

9        THE DEFENDANT:  I would like to.

10       When I thought about today I've been thinking

11  about it, and I never -- I didn't know exactly what I wanted

12  to say or how I could express exactly what I feel or why I

13  did what I did.

14       I have sat down and tried to plan out the words

15  that I want to explain things, but it does not work that

16  way.  I was sitting outside last night just thinking about

17  it, and just thinking back over the past couple of years

18  when this began, when I first moved out here.

19       I was thinking about everything that I had

20  achieved, and I began to wonder, and I asked myself, how did

21  I get so far from that young woman than I once was?

22  I was just ready to take on the world then, live her dreams

23  and make everybody proud of her.

24       I just could not fathom how I had let myself fall

25  so far.  There is no excuse.  No justification for what I

19

1   did.

2          Mr. Vanegas explained my health issues.  My health

3   crisis.  But not as a justification nor as an excuse.  I

4   would never try to do that, because my actions were above

5   and beyond wrong and shameful.

6          When I started doing it I guess somehow I managed

7   to not let myself think about the wrongness of it.  I was

8   falling.  I was trying to deal with the fact that I could

9   have an illness that would probably eventually kill me, and

10  I started to lose control of my life.

11         And I felt that this bit of me that was broken

12  inside I could not fix it, but I thought if I could at least

13  fix the outside somehow that somehow I could hold on.  I

14  could control that, and I could hold on, and I could keep

15  going.

16         And it is true that I did keep records of

17  everything, because I did want to pay it back.  Every last

18  cent.  I wanted to be a success.  I wanted to help the

19  company.

20         When I was faced with the reality of what I had

21  done, there are no words to describe the shame and the

22  humiliation, the regrets that I felt, because it is not just

23  monetary damage that I caused this company, I betrayed

24  people that I cared about, people that had given me an

25  opportunity, people that trusted me.

20

1      And although I can pay the money back, one thing I

2  can never pay back is that wrongdoing and that trust my

3  actions took away from them.

4      I know that it is going to be a very long time

5  before I can accept myself again.  There is not one day

6  that goes by when I do not think about my actions, that I

7  don't feel the shame, the sadness, the regret at what I did,

8  that I don't strive to work harder to try to get back to

9  what I once was, to make of myself someone that I can once

10  again be proud of, to be the person I can give back to a

11  company.

12      I can't get back the trust or the time that I took

13  from them, but I want to at least give back the money like I

14  always intended to.  I want to go back to being the person I

15  once was before all this went wrong.  I want to be the one

16  that makes my family proud, a person that never thought she

17  would be capable of all of this.

18      THE COURT:  I hope you will be able to do that in

19  the future.

20      THE DEFENDANT:  I am profoundly sorry.

21      THE COURT:  Is there anything else you wanted to

22  say this afternoon?

23      THE DEFENDANT:  If I could someday -- I could be

24  given the opportunity to apologize to them in person.  I

25  know it will be one of the most difficult things to do,

21

1    because I feel so ashamed.   I don't know if I could meet

2    their eyes.

3            But I hope that -- I know they will be able to

4    forget, but I hope that someday -- someday I can apologize

5    to them in person.   I can give them the money that I took,

6    and I hope they can somehow, someday in the future find it

7    in their hearts to forgive me, even though I know they will

8    never forget it, and neither will I.

9            Thank you.

10           THE COURT:   Let me make some technical findings at

11   this point for the record every one.

12           Under the advisory guidelines the total offense

13   level is 14.   I am accepting the calculations made by the

14   probation office, and I do believe that the offense level of

15   eight needs to be increased by two levels, because the

16   defendant certainly did hold a position of trust.

17           The government has made clear the very substantial

18   cooperation that the defendant provided and that a three

19   level decrease is justified because of that level of

20   cooperation.

21           All of that leads to a total offense level of 14.

22   The defendant has no criminal record whatsoever, and

23   therefore she is in criminal history Roman numeral one.   In

24   terms of the advisory guidelines, that places her in a range

25   of 15 to 21 months.

22

1           Our Court of Appeals, as I know counsel know, has

2    ruled that any sentence within the advisory guideline range

3    is presumptively reasonable, and I do give very heavy

4    consideration to the guideline range.

5           I do also have to consider other federal law, and

6    in particular 18 U.S.C. 3553, which again counsel are very

7    familiar with and which sets forth many factors that I have

8    to take into account.

9           There is no question that Ms. Guillen's personal

10   situation is an extremely tragic one.  She did well in

11   school.  She went to a good school, a good college.  She

12   clearly excelled there.

13          She has a facility for foreign languages.  She

14   worked in Paris for either one or two years, came back to

15   the United States.  As a young person she came to the

16   District of Columbia, as so many other young people have

17   done over the centuries, and got a good job, a decent job --

18   more than a decent job, a good job.

19          Certainly there have been many problems with her

20   family in terms of assaultive -- terrible assaultive

21   criminal conduct that her family suffered from.

22          I know her mother has been ill for many tears

23   years, and that upon coming to the District of Columbia the

24   defendant went through a real siege of medical problems, a

25   siege that was worse because it was particularly difficult

23

1    to diagnose what was troubling her.

2             And I am well aware that the condition of

3    fibromyalgia is particularly difficult -- difficult to

4    diagnose, because it has many manifestations, and there are

5    no easy markers for it.  And then, of course, I do know the

6    diagnosis of lupus.

7             I certainly am aware of the very substantial

8    cooperation that she gave the government, and probably

9    without it the victim would have had trouble putting

10   together all of its own records and attempting to recoup its

11   losses if it has insurance, and I don't know whether it does

12   or not.

13            So I have taken all of that into account.  One of

14   the purposes of the advisory guidelines' framework is to

15   help provide consistency in sentencing, and I think that is

16   an important purpose, and certainly it is one of the many

17   reasons that I will follow the guidelines unless I am

18   convinced that the factors in 18 U.S.C. 3553 require a

19   sentence that is different than the guidelines.

20            One of the factors I have to consider is the need

21   for this sentence to reflect the seriousness of the offense,

22   to promote respect for law and to afford adequate deterrence

23   to criminal conduct.

24            There are other things I have to consider under

25   this statute which I have spelled out, but those are three

24

1    things that I have to consider that are particularly

2    relevant to this sentence.

3         And this is a very difficult sentencing, there is

4    no question about it.  More than $100,000 was embezzled.

5    That is an enormous amount of money.  What is more, the

6    victim was a nonprofit organization that was doing

7    extremely good and useful things for the betterment of the

8    world, and that is spelled out in the declaration for the

9    record.

10         I mean essentially that institution was working

11   with developing countries to enhance their abilities to

12   support and encourage intellectual property development

13   within their own countries.

14         The embezzlement of more than $100,000 is just

15   extraordinarily serious, and there has to be adequate

16   deterrence of this kind of criminal conduct.

17         I received the answer to my question that Ms.

18   Guillen had health insurance, and I well know that health

19   insurance, even the most beneficial kind, does not pay for

20   everything.  But she did not steal the money to pay for

21   medical treatment.  Some prescriptions it is true, but not

22   for medical treatment.

23         I am not sure that there is ever any justification

24   for stealing, but assuming that there can be, certainly what

25   the money was used for in this case could never come under

1    the rubric of necessity.

2          Ms. Guillen has lots, and lots, and lots of

3    potential for the future.  She has behaved honorably since

4    her employer found out what was going on.  She has tried to

5    cooperate and has cooperated, and I know all of that, and I

6    to take all of that into account, and of course she is a

7    very bright person who is capable of doing well in this

8    world, but I just cannot close my eyes to the seriousness of

9    this offense.

10          From the government's -- I don't mean the

11    government.  From the public's perspective a sentence of

12    probation, while it may be onerous to the defendant because

13    of various conditions imposed, is certainly not perceived by

14    the public as onerous, and I don't think that it reflects

15    the seriousness of this offense or offers adequate

16    deterrence.

17          I have spoken more than I should have probably

18    because, Ms. Guillen, this is not an easy sentence to

19    impose, and I certainly feel very sorry that your life has

20    taken this turn.

21          I do think that the guideline range is reasonable

22    and meets the requirements of 18 U.S.C. 3553.  Given your

23    total lack of record and your cooperation, I think a

24    sentence at the very bottom of the guidelines is

25    appropriate.

26

1          The sentence in this case will be a sentence of 15

2   months.

3          THE DEFENDANT:  No!  (Crying.)

4          THE COURT:  There will be a period of supervised

5   release --

6          THE DEFENDANT:  No!  (Crying.)

7          THE COURT:  -- of two years.  There is restitution

8   --

9          Would you like to have a seat while I finish?

10         THE DEFENDANT:  Your Honor, please.

11         THE COURT:  Do you think it would be easier -- I

12  cannot suggest that your client step outside, I cannot do

13  that.  She has to be told certain things on the record.  She

14  has to hear them.

15         So Ms. Guillen, try to get a hold of yourself for

16  a few minutes.

17         There is a requirement of restitution of $107,000

18  -- $107,208.31.  A special assessment of $100 that either

19  can be paid before this sentence begins or from prison

20  earnings.

21         There will be voluntary surrender, and Ms.

22  Guillen, what that means -- and try to listen for a minute.

23  It means that you do not have to go to the D.C. jail today.

24  You will not have to go to D.C. jail.  The Bureau of Prisons

25  will designate the most appropriate prison.  You will get

1  two months credit for the time you served.

2          I am being very practical now.  Out of the 15

3  months you will probably get two months credit.  That will

4  reduce it to 13 months, and you will be sent back into the

5  community approximately six months before the time that your

6  sentence ends.

7          So you will be serving an actual sentence of

8  approximately -- the Bureau of Prisons decides these

9  questions, but approximately nine months.

10          You do have the right to take an appeal from this

11  sentence.  If you want to do so you should tell Mr. Vanegas,

12  and you have to let him know within 10 days.  That is a very

13  important deadline.

14          Do you understand that?

15          THE DEFENDANT:  (Nodding head.)

16          THE COURT:  In terms of supervised release and

17  other technicalities, there has to be a DNA testing.  That

18  is a requirement under the statute.  I don't think there is

19  any justification for necessity for drug testing.

20          Is there anything else that probation wants me to

21  cover?

22          THE PROBATION OFFICER:  Your Honor, I do

23  apologize.  Any financial disclosure would also be helpful.

24          THE COURT:  I am sorry?

25          THE PROBATION OFFICER:  A financial disclosure.

1          THE COURT:  During supervised release?

2          THE PROBATION OFFICER:  Yes.

3          THE COURT:  That will be ordered.

4          And there is one thing that probation asked me to

5    make clear on the record, and so I want to.  I do

6    understand that the defendant's present employer does not

7    know about this situation.  I did not ask the question, and

8    I don't need to ask it because I have ruled, but I did not

9    ask the question as to whether this employer was lied to or

10   not.

11         I don't know, and I'm certainly not suggesting

12   that that is the case, but the employer has got to be

13   notified just in case there are any irregularities.  We

14   have a duty to protect the public in economic crimes

15   certainly.

16         So probation is therefore free to contact the

17   employer.  If it does not violate any probation's

18   guidelines, I would recommend that you do that after

19   voluntary surrender.  That way there is as little disruption

20   as possible.  But if your guidelines are to the contrary,

21   I'm certainly not suggesting that you violate your

22   guidelines about that.

23         THE COURTROOM DEPUTY:  Will interest be waived on

24   restitution?

25         THE COURT:  Yes.

29

1        Parties may be excused at this time.

2       (Whereupon, the proceedings were adjourned.)

3              - - - - -

4           CERTIFICATE OF COURT REPORTER

5    I certify that the foregoing is a correct transcript of

6  the proceedings in the above-captioned case.

7

8

9         SUSAN PAGE TYNER, CVR-CM

10         OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
          Plaintiff-Appellee,    )
                                )
     v.                          )    Crim. No. 07-100 (GK)
                                )    (Appeal No. 07-3077)
MARIBEL A. GUILLEN,              )
                                )
          Defendant-Appellant,   )
                                )
_____ )

## ORDER

    Upon consideration of Defendant's motion for release pending

appeal (Dkt. 35), the government's opposition thereto, any reply,

and the entire record herein, it is this ____ day of _____,

2008,

    ORDERED, that, for the reasons stated in the government's

opposition, Defendant's motion be, and hereby is, DENIED.


                              _____
                              GLADYS KESSLER
                              United States District Court Judge



Copies to: attorneys on record via ECF